**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL K. RILEY,** | : | |
| **Plaintiff,** | : | **Case No. 2:06-cv-713** |
| **v.** | : | **Judge Holschuh** |
| **COLUMBUS BOARD OF EDUCATION, et al.** | : | **Magistrate Judge King** |
| | : | |
| **Defendants.** | : | |
| | : | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

This employment discrimination action is before the Court on a motion for summary judgment filed by the defendants Columbus Board of Education ("Board of Education"), Gene T. Harris, Cary Cordell, Nicole Edwards, Maurice Oldham, Lester Howell and Harman Moore (collectively known as "defendants"). Michael K. Riley, a plaintiff proceeding <u>pro se</u>, claims that the defendants violated the American with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, <u>et</u> <u>seq.</u>, by discriminating against him because of an alleged disability he sustained while working as a custodian for the Columbus Public School District ("CPS"). Mr. Riley also alleges that he was retaliated against for filing a claim with the Equal Employment Opportunity Commission ("EEOC"). The motion is now fully briefed and ripe for adjudication.[1] For the following reason, the motion will be granted.

I.

Mr. Riley has a history of employment with the CPS, where he started as a substitute

---

[1] The Court notes that the plaintiff, Michael K. Riley, filed a "Motion to Deny Defendants['] Motion for Summary Judgment" (doc. # 26), in response to the defendants' motion for summary judgment. The Court will treat this "motion" as Mr. Riley's response.

custodian in 1996.  (Dep. of Michael K. Riley, p. 33 (doc. #19)).  Throughout the course of his employment, he was eventually promoted to head custodian in 2003.  (Id. at 55-57).  He was subsequently discharged in 2005.  As described, infra, he appealed his discharge to the Municipal Civil Service Commission, which, in March 2006, recommended that he be demoted rather than discharged.  The record is not clear regarding action taken by the CPS following the Commission's recommendations, but it is clear that Mr. Riley did not return to work and has not worked since April 2006.  He contends that he cannot return to work because of his alleged disability.

Mr. Riley claims that he was initially diagnosed with a disability under the ADA following a 2001 incident where he was "thrown" from a lawnmower and injured his neck and back.  (Id. at 51; 183; 194).  Mr. Riley alleges that he aggravated that same neck/back injury when he was attempting to store a table while working at Barrett Middle School in 2004, and again, in April 2006, while mopping stairs.  Following these incidents, Mr. Riley highlights the fact that when he was able to return to work, his doctor limited him to "light duty" due to the pain, which according to Mr. Riley, consisted of "[n]o constant standing, not to pick up nothing heavy probably over 20 [p]ounds. Nothing - no consistent lifting or anything.  No riding the lawnmower.  No long distance driving or commercial driving.  Just - and to be able to rest on my own discretion."  (Id. at 177).  According to Mr. Riley, the doctor meant that he "could call off or kind of work at [his] own discretion ...." (Id.)  Mr. Riley suggests that his repeated injuries were possibly due to the fact that he "felt rushed" to return to work and failed to rest sufficiently his neck and back.  Mr. Riley testified:

> I felt that I was being pressured to go back to work and I might have went back to work a little too soon, but I got some correct medication which kind of like dulled the pain enough and I asked the doctor, I told him they was harassing me, would he let me, would I be able to go back to work, and he said as long as the pain is not overwhelming I could.

(Id. at 176).

During Mr. Riley's course of employment with the CPS, it appears that he was disciplined for various reasons due to work performance.  Following a series of incidents in 2005, Mr. Riley believed that he was being wrongfully disciplined because of his alleged disability, not his conduct, as the CPS suggests.  Accordingly, in December 2005, Mr. Riley filed charges with the EEOC alleging ADA violations.  After formal review, the EEOC was unable to conclude that the information obtained established violations of the ADA.  (Complaint (doc. #4), p. 5).

Mr. Riley subsequently filed suit in this Court alleging ADA violations.  The defendants moved for summary judgment arguing, inter alia, that Mr. Riley's injuries do not constitute a "disability" under the law.  The defendants also contend that there is no evidence of retaliation.  Mr. Riley responded claiming that he was treated unfairly because the defendants retaliated against him.

II.

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action."  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed.R.Civ.P. 1).  The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467 (1962) (quoting Sartor

v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)).  See also Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1347 (6th Cir.1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried.  Lashlee v. Sumner,  570 F.2d 107, 111 (6th Cir.1978). The court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir.2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law. Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir.2003).  All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986);  Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir.2001).  Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48 (emphasis in original).  A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application

4

of [an] appropriate principle of law to the rights and obligations of the parties." Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir.1984). See also Anderson, 477 U.S. at 248. An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. See also Leary, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322. The nonmoving party must demonstrate that "there is a genuine issue for trial," and "cannot rest on her pleadings." Hall v. Tollett, 128 F.3d 418, 422 (6th Cir.1997).

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. Anderson, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Phillip Morris Companies, Inc., 8 F.3d 335, 340 (6th Cir.1993). The court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. Anderson, 477 U.S. at 251-52; Lansing Dairy,

5

Inc., 39 F.3d at 1347. It is with this standard in mind that the Court will decide the motion.

III.

Based on a liberal reading of Mr. Riley's complaint, it appears that he alleged two separate causes of action under the ADA. First, he claims that the defendants discriminated against him because of his disability. Second, Mr. Riley contends that he was retaliated against in violation of the Act.

A. Discrimination under the ADA

42 U.S.C. § 12112 states, in relevant part, that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability in regard to ... advancement, or discharge ...." Discrimination under the ADA may be proven by introducing direct evidence of intentional discrimination. See, e.g., Hopkins v. Electronic Data Sys. Corp., 196 F.3d 655, 660 (6th Cir.1999). In instances where there is no direct evidence available, however, the plaintiff can establish a prima facie case of discrimination by proving (1) he is disabled; (2) he is otherwise qualified for the position; (3) he suffered an adverse employment action; (4) the employer knew or had reason to know of his disability; and (5) after the adverse employment action, the position remained open, or the disabled individual was replaced with a member outside the protected class. Id. (citing Monette v. Electronic Data Sys. Corp., 90 F.3d 1173, 1185 (6th Cir.1996) and Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1246 (6th Cir.1995)). If the plaintiff establishes a prima facie case, the burden shifts back to the defendants to articulate a legitimate, non-discriminatory reason for the adverse employment action. Id. Finally, if the defendants provide such an explanation, the burden again shifts back to the plaintiff to establish that the defendant's non-discriminatory reason is a mere pretext for discrimination. Id.

6

<u>1. Necessity to Show a Disability under the ADA</u>

Under the ADA, a "qualified disabled individual" means "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A disability, with respect to an individual, is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such impairment; or being regarded as having such impairment." 42 U.S.C. §§ 12102(2)(A)-(C). Further clarification under the regulations state:

(h) Physical or mental impairment means:

(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

(2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

(i) Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

(j) Substantially limits -

***

(3) With respect to the major life activity of working -

(i) The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. §§ 1630.2(h)-(j)(3)(i).

The Supreme Court clarified further that, while the term "substantially limits," may be difficult to define, "'[s]ubstantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree.' The word 'substantial' thus clearly precludes impairments that interfere in only a minor way with the performance of manual tasks from qualifying as a disability." Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 196-97 (2002)(internal citations omitted). Merely having an impairment does not make one disabled under the reach of the ADA. Id. at 195. The impairment cannot be moderate or intermittent, Mahon v. Crowell, 295 F.3d 585, 590-91 (6th Cir.2002), but instead must be substantial, and long-term or permanent, to be a "disability" under the Act, see, e.g., Williams, 534 U.S. at 198 (indicating that "[t]he impairment's impact must also be permanent or long-term)(citing 29 C.F.R. §§ 1630.2(j)(2)(ii)-(iii)).

The Court also notes that an employee may satisfy the first prong of the prima facie case by demonstrating that, although he or she was not actually disabled, the employee was "regarded as having a physical or mental impairment." 42 U.S.C. § 12102(2)(c); Sutton v. United Air Lines Inc., 527 U.S. 471, 489 (1999). As the Court of Appeals stated in Ross v. Campbell Soup Co., 237 F.3d 701, 701 (6th Cir.2001), "an individual may fall into the definition of one regarded as having a disability if an employer ascribes to that individual an inability to perform the functions of a job because of a medical condition when, in fact, the individual is perfectly able to meet the job's duties."

There appears to be some Supreme Court language suggesting that "working," as it relates to "major life activities," is problematic. See Williams, 534 U.S. at 194 (questioning whether the EEOC had authority to issue a regulation that included "working" under "major life activities"); see also Sutton, 527 U.S. at 492 (opining that "there may be some conceptual difficulty in defining

8

'major life activities' to include work").  The Court of Appeals for the Sixth Circuit, however, has recognized that working is a major life activity under the ADA.  See, e.g., Mahon, 295 F.3d at 590 (working is a major life activity)(citing Henderson v. Ardco, Inc., 247 F.3d 645, 652 (6th Cir.2001)(same) and Ross, 237 F.3d at 709 (same)).  Because "working," as it relates to whether it should be included in the definition of "major life activities," is not raised here, the Court will proceed and analyze whether Mr. Riley's alleged disability substantially limits major life activities, including working.

In the instant case, Mr. Riley claims that his disability is an "arthritic neck condition,"  (Dep. of Michael K. Riley, p. 195 (doc. #19)), that may need surgery to correct, (id. at 189-91).  Currently, Mr. Riley states that he is receiving therapy and is taking steroid, anti-inflammatory and pain medications.  (Id. at 184-90).  Mr. Riley describes his condition as follows:

Q. And when were you told that you had arthritis in your neck?

A. Well, I wasn't never told.  I had to find out on my own.  Because I kept having problems with my neck.

And so I went and got the - on my own I or luckily I found out what the report was on my neck and my lower lumbar region, through the Workers' Comp system I was able to receive the diagnosis from the doctors who checked out my X-rays and what their concerns were on the X-rays.

Q. So no doctor ever told you that you had arthritis anywhere in your spine.

A. No, the doctor didn't actually come to my face and tell me.  No.  Until later.

Q. When was it later that you found out you had arthritis?

A. Like I said, when I looked at the old -

Q. The question is though did a doctor ever tell you that you had arthritis?

A. No, they didn't tell me I had arthritis.

Q. So you found out by looking at the Workers' Comp records.

A. Yeah.  They just said I had a sprain in my neck or back.

Q. Did a doctor ever tell you you had this neck curvature?

A. No.

Q. And how did you find that out?

A. Through the Workers' Comp information that the [Board of Education] filed a disability grant due to the arthritic nature and condition of my neck.  Which blocks the healing process in my neck, and their grant was okayed because of the condition.

   That's when I looked at it and saw how did they - because I was wondering why my neck never healed up and I found out I had a condition in my neck.

Q. When did you find this out about the arthritis and the curvature in the neck?

A. It was after, it was in 2004.  When I hurt myself again.  Because I thought I was going to have to file -

Q. So found this out after your second injury [sic].

A. Yeah, after the second injury.

Q. I just want to talk about what you knew related to the first injury?

A. I didn't know I had that.  I just knew it was still sore.  That's all.  I just didn't know I had it.

(Id. at pp. 162-64).

Despite his condition, Mr. Riley stated that he can still groom himself, cook for himself and his family, bathe himself and shop for groceries.  (Id. at 238).  To some extent, Mr. Riley testified that he can still drive a short distances (due to the sitting and bumpiness, not necessarily the driving), traverse stairs, lift up to 30 pounds, run the vacuum, and dust.  Mr. Riley stated:

Q. Are you able to walk?

A. Yes, I'm able to walk, yes.

10

Q. Can you traverse up and down stairs?

A. Yes, long as I don't have to do it leaning down. I can walk upstairs if it's not constant. Every now and then - I'm not crippled per se.

Q. What do you mean by as long as you don't have to lean down?

A. Like if I had to mop some stairs or something. That I could probably do there, but it might aggravate that area in my neck again. Which causes me to be out of work.

Q. Are you able to lift things?

A. Not constantly. Not too heavy right now. This is right at the moment.

***

Q. Can you lift Rain, your daughter?

A. Not for long periods of time, no.

Q. How about Chance?

A. No, I definitely can't. He's too big, and he's the youngest. He looks like he's seven. No.

Q. What is the maximum you can lift?

A. You know, I think I can lift probably 30 pounds, as long as it's not constant. As long as I can like set it down and don't have to - you know how if you worked on a loading dock or something, I couldn't just pick it up and do like that 30 pounds. But if let's say I run over -

Q. You mean repeated actions?

A. Yes. Let's say I had to run into something like a rock or something and I need t push it out of the way, I can do that as long as it's not a constant thing that builds up. It causes muscle spasms, that's the main thing.

Q. Are you able to sweep, run the vacuum?

A. In a short area, yes.

Q. Are you able to like do dusting and make your bed, housecleaning?

11

A. I can do all those things?

Q. Are you able to take care of your children?

A. Yes.

Q. Tell me then what you're unable to do?

A. Well, what I used to be able to do, I used to be able to play basketball.  I can't do that.  I used to be able to mow, I can't do that.

I used to able to pick up my daughter and my son when they was little.  But I guess I couldn't do it now even if I probably wasn't hurt.  Kind of big.

But I used to be like you say job and do - stay up.  Used to be able to play cards.  Used to do all kinds of things.

Used to able to work constantly without having to stop.  Before that accident.  Like I had kind of an easy kind of job where I don't have to that constantly.

Like if I had to pick up refrigerators or something for Sears, I wouldn't be able to do that now, where I used to could have.  I mean I'm only 46, I should be able to do it.

Q. What else are you unable to do now?

A. Like I said, I'm not able to without taking my medicine.  Now, when I take my medicine, I can do stuff for - as long as it's not lifting.

When I take my medicine, even though I'm dizzy, I can sit up and we can have this deposition.  I could sit here for a while, if I take strong medicine.

But just not taking the medicine, I would have to lay down.  We wouldn't be able, you know how we - you said we could go on break, I would have to do that every 20 minutes or so.

Q. And you regularly take your medicine; correct?

A. Yes.  Once I don't - as long as it doesn't cause a diverse reaction.  This medicine I'm taking now, even though it seems to be working and helping the pain, it's causing numbness in everywhere.

It's kind of like it's not causing numbness but it's kind of like making everything kind of like it's taking the pain away from everywhere.  It's like I'm getting numb

12

through everywhere.

Q. Is it numbness or you don't have any sensation?

A. Yeah, I have sensations.  It's like I have no sensations.  Because the numbness is what I'm trying to get rid of.  It's taking care the pain numbness.

(Id. at 240-43).

### a. Major life activities other than working

The regulations state that "major life activities," other than working include caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, and learning.  29 C.F.R. § 1630.2(i).  Based on Mr. Riley's testimony, supra, it is clear that his arthritic neck does not interfere with any of these activities.   (Dep. of Michael K. Riley, pp. 238-41 (doc. #19)).  In fact, Mr. Riley clearly stated that he can walk, speak, groom himself, bathe himself and care for himself and his family.  Accordingly, there is insufficient evidence to support a finding that Mr. Riley's alleged disability interferes with major life activities, other than working.

### b. Major life activity of working

The Supreme Court, in Sutton, established a guideline in determining whether a plaintiff is substantially limited in the major life activity of working.  The Court stated:

> To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice.  If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs.  Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

Sutton, 527 U.S. at 492.  To determine if a plaintiff is precluded from a substantial class of jobs due to a disability, a court must compare the allegedly disabled plaintiff's access to jobs to other similarly educated, trained and experienced non-disabled individual's access to jobs.  Id. at 491-92;

see also Mahon, 295 F.3d at 591.  A plaintiff must show that he or she is "significantly restricted in ability to perform either a class of jobs or a broad range of jobs in various classes.  The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."  29 C.F.R. § 1630.2(j)(3)(i).

As the Sixth Circuit Court of Appeals noted in Mahon, prior to the Supreme Court's Williams decision, the Court of Appeals "allowed claimants to assert they were substantially limited in the major activity of working when they showed their impairments barred them from a significant percentage of available jobs."  Mahon, 295 F.3d at 591.  But, following Williams, where the Court clarified that "substantially limits" should be read "strictly to create a demanding standard for qualifying as disabled," 534 U.S. at 197, the Court of Appeals determined that its previous standard was "less-than-demanding."  Id. at 592.  Under the higher scrutiny, for example, the Court of Appeals concluded that substantially limited in major life activity of working does not include failing to qualify for half the available jobs a claimant may have been qualified for prior to the disability.  See id. ("We would be using a less-than-demanding standard were we to find Mahon substantially limited in working when he is still qualified for over half the jobs he was qualified for before his injury").

Although the Court views the evidence in a light most favorable to Mr. Riley, under the ADA burden-shifting framework, Mr. Riley has the first burden to present evidence that he is in fact disabled.  Based on the uncontroverted evidence in the record, however, the Court concludes that Mr. Riley has failed to meet that burden.  In reaching this conclusion, the Court focuses on the fact that there is absolutely no evidence that Mr. Riley is permanently disabled, nor is there any evidence that, because of his alleged disability, he is precluded from more than one type of job, a specialized

14

job or a particular job choice.

The record indicates that when Mr. Riley is taking his medication, his pain, which is allegedly usually a 10/10 (on a scale of pain with 1/10 being little pain and 10/10 being severe pain), subsides to a 3/10.  (Dep. of Michael K. Riley, p. 245 (doc. #19)).  Mr. Riley also states that he can perform his job functions in an intermittent manner while taking his medication.  (Id. at 239-40).  Mr. Riley testified that he can walk, lift (although only 30 pounds), traverse stairs, sweep, dust, and run the vacuum, so long as it is not repetitive.  (Id. at 239-41).  According to Mr. Riley's own statements, he believed that he could continue to do his custodial job without random rest breaks when his injury properly heals.  (Id. at 247).  He also highlighted the fact that his doctors recommended surgery to fix his alleged disability, but, so far, he has declined the procedure because he would likely miss more work.  (Id. at 190).  Being able to perform all these tasks while on medication, granted with some random rest breaks, coupled with the fact that Mr. Riley believes that his injuries will properly heal either through rehabilitation or surgery, leads to the conclusion that Mr. Riley, at the most, has an intermittent impairment and certainly not a long-term or permanent disability.

Equally important, however, is the fact that Mr. Riley has failed to prove that he is significantly restricted in his ability to perform either a class of jobs or a broad range of jobs in various classes in order to be found that he is substantially limited in the major life activity of working.  Mr. Riley has produced no evidence indicating that he is unable to secure a similar custodial job where custodians perform "light duty" (as Mr. Riley describes it) activities.  There is also no evidence that Mr. Riley is unable to perform a large number of jobs in other categories of employment.  According to Mr. Riley's own admissions, he has not sought out other employment

or taken the Civil Service exam to determine whether he would even be eligible for other jobs with

CPS. The record states:

> Q. Have you tried to find any other type of employment with the School District?
>
> A. I wouldn't mind. I asked them that.
>
> Q. When did you ask them?
>
> A. I asked them could I work in a light duty area and maybe just stay there with something where, you know, like I ain't going to say like the library or something, but maybe where I can work with the kids or something for a minute or something, or something where I can sit down.
>
> Q. Who did you ask that to?
>
> A. I asked I think it was the Labor Relations people, I asked them could I do light duty.
>
> Q. And what did they say?
>
> A. They said there's no light duty for that. I either have to come back full duty or whatever.
>
> Q. So there's no specific jobs that are labeled light duty and only light duty.
>
> A. No. It's really kind of hard because everything is repetitive and everything. But I could do a repetitive sit-down job, take my medicine.
>
> Q. Have you tried any Civil Service tests for any other jobs within the School District?
>
> A. No, not yet, because I was going to try to see if I could go back as custodian.
>
> Q. Do you have plans to go back as the custodian?
>
> A. Well, if this medicine that I'm taking now continues to seem to take that stiffness out of my neck and let me be able to turn my head properly without injurying - reinjuring that area, then I plan on.

(Dep. of Michael K. Riley, p. 246-47 (doc. #19)).

It is insufficient for Mr. Riley to present evidence showing that at the present time he cannot

16

perform his previous work as a custodian for the CPS.  Instead, Mr. Riley must show that he is "significantly restricted in ability to perform either a class of jobs or a broad range of jobs in various classes."  29 C.F.R. § 1630.2(j)(3)(i).  There is no testimony or evidence from Mr. Riley's doctors indicating that his alleged disability limits him from performing *any* of his custodial tasks, let alone indicating that he is disabled from performing work in other types of jobs.  Mr. Riley's claim, standing alone as it does, that he cannot fully perform his former duties as a head custodian at a particular school is not sufficient to meet the requirements of a prima facie case under the ADA.

Moreover, Mr. Riley has also failed to prove that he cannot perform a broad range of jobs in various classes, including those outside the custodial field.  Put simply, the record fails to identify any list of jobs that Mr. Riley does or does not qualify for because of his alleged disability.  The only evidence admitted in the record regarding "broad range[s] of jobs in various classes" is Mr. Riley's admission that he could perform a desk job, so long as he takes his medication.  This runs contrary to any conclusion that Mr. Riley is substantially limited in the major life activity of working.[2]

This conclusion is consistent with the Court of Appeals decisions in Bryson v. Regis Corp., 498 F.3d 561 (6th Cir.2007), and Mahon.  In Bryson, a former salon manager brought suit alleging disability discrimination under the Kentucky Civil Rights Act, which mirrors the ADA.  The Court of Appeals, in affirming the district court's decision granting summary judgment in favor of the employer, determined that the allegedly disabled plaintiff was not substantially limited in the major life activity of working, despite the fact that the plaintiff presented evidence that she could no longer work as a salon manager.  The Court of Appeals concluded that the information presented was

_____

[2] There is also no evidence in the record that the position remained open or that Mr. Riley was replaced with a member outside the protected class.

insufficient because the plaintiff failed to show that she was "significantly restricted in ability to perform either a class of jobs or a broad range of jobs in various classes." Bryson, 498 F.3d at 576 (quoting 29 C.F.R. § 1630.2(j)(3)(i)).  The Court of Appeals opined that the plaintiff "has not established that her medical condition bars her from working in all jobs within the cosmetology field, or that it prevents her from holding a large number of jobs in other categories of employment." Id. (referencing Olds v. United Parcel Service, Inc., 127 Fed.Appx. 779, 782 (6th Cir.2005)(per curiam) (unpublished) (stating that the plaintiff's "lifting restriction prevents him from working as a delivery driver and from performing other jobs at UPS specifically, but there is no evidence in the record that it prevents him from engaging in a broad class of jobs")).

In Mahon, the plaintiff asserted that a back injury precluded him from working as a "steamfitter," as well as all manual building trades jobs.  Mahon, 295 F.3d at 591.  As evidence of this, the plaintiff submitted an affidavit from a disability analyst who concluded that, based on the plaintiff's work restrictions and a study of the local labor market, the plaintiff "suffered a 47% loss of access to his job market."  Id.  The Court of Appeals concluded that, under the Supreme Court's Williams decision, this was insufficient to prove that the plaintiff was substantially limited in the major life activity of working.  Id. at 591-92.  The Court of Appeals stated:

> We would be using a less-than-demanding standard were we to find [the plaintiff] substantially limited in working when he is still qualified for over half the jobs he was qualified for before his injury.  There is also reason to discount [the disability analyst's] study.  Her analysis began with the assumption that [the plaintiff] is not unable to work as a steamfitter.  After his injury in 1988, however, [the plaintiff] worked as a steamfitter for TVA, albeit with restrictions.  In 1998, he asserted that he was still qualified to work as a steamfitter (with restrictions), and protested when TVA did not reemploy him in that position.  Each of these factors militate against [the plaintiff's] assertion that he was substantially limited in working; together they justify the district court's conclusion that he was not substantially limited in the activity of working.

Id. at 592.

Based on the foregoing, the Court concludes that Mr. Riley has failed to establish a prima facie case of discrimination. Specifically, Mr. Riley has failed to provide sufficient evidence that he is disabled and is substantially limited in one ore more of the major life activities.

### 2. Regarded as Disabled

Under the ADA, an individual who is "regarded as" disabled counts as disabled for the purposes of the Act. 42 U.S.C. § 12102(2)(c). To determine whether an individual is "regarded as disabled," the Court must apply test outlined in Sutton:

> There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.

Sutton, 527 U.S. at 489.

In the instant case, the Court notes that Mr. Riley does not argue, nor presented evidence, that he was "regarded as" disabled. A review of the evidence also does not appear that the defendants viewed him as such. While the evidence does suggest that some defendants knew that he was receiving workers' compensation benefits due to his alleged injuries, there is no evidence that the defendants treated him as if he had a disability. Instead, the evidence is to the contrary because, despite his alleged impairments, Mr. Riley stated that the defendants wanted him to come back to work in full capacity. Thus, the Court concludes that there are no genuine issues of material fact that the defendants mistakenly believed that Mr. Riley had a physical impairment that substantially limited the major life activity of working. Moreover, there are no genuine issues of material fact that the defendants mistakenly believed that an actual, nonlimiting impairment

19

substantially limited the major life activity of working.

### B. Retaliation under the ADA

Simply because a court concludes that a plaintiff is "not disabled" under the ADA does not mean that the plaintiff cannot make out a claim for retaliation under the Act. See Bryson, 498 F.3d at 576-77 (concluding that the district court erred when it concluded that because the plaintiff was not disabled, she could not show that the defendant retaliated against her under the ADA). A plaintiff may succeed on an ADA retaliation claim "even if the underlying claim of disability fails." Id. at 577 (quoting Soileau v. Guilford of Maine, Inc., 105 F.3d 12, 16 (1st Cir.1997)).

To make a claim for retaliation under the ADA, a plaintiff again must establish a prima facie case of ADA-retaliation. This means a plaintiff must prove that (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse employment action. Penny v. United Parcel Service, 128 F.3d 408, 417 (6th Cir.1997). If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to identify a legitimate, nondiscriminatory reason for the adverse employment action. Id. The burden then shifts back to the plaintiff to prove that the defendant's proffered reason is just a pretext for discrimination. Id.

In the instant case, Mr. Riley did engage in protected activity by filing a complaint with the EEOC in December 2005. He must present evidence to establish a prima facie case for retaliation identifying a causal connection between adverse employment action and the protected conduct. The affidavit of Maurice Oldham, the CPS custodial supervisor, describes Mr. Riley's employment history:

> Mr Riley's file shows that he was hired as a substitute custodian from the [CPS] on October 14, 1996. Thereafter, Mr. Riley became Custodian II at Wienland Park on

20

March 16, 1998.  Between June 1998 and April 1999, six conferences were held regarding Mr. Riley's failure to follow instructions and poor job performance.  Mr. Riley filed alleged "grievances" related to unsafe work conditions and lack of access to supplies and equipment in March 2000, which were denied.  On July 11, 2001, Mr. Riley was involved in a lawnmower incident while working at Beery Middle School.  In mid August 2001, Mr. Riley returned to work.  On August 24, 2001, a hearing was held regarding Mr. Riley['s] failure to follow instructions.  Mr. Riley took a leave of absence and returned to work on October 30, 2001.  On April 10, 2002, Mr. Riley became a Custodian II at Beery Middle School.  In late June 2002, the school district received two letters from Mr. Riley about the head custodial position.  On July 1, 2002, Mr. Riley filed a grievance related to his failure to obtain a head custodian position.  On May 21, 2003, Mr. Riley became Head Custodian II at Champion Middle School.  On November 21, 2003, a conference was held regarding Mr. Riley's failure to properly prepare the Champion Middle School for voting.  On January 14, 2004, there was a hearing held on Mr. Riley's excessive absenteeism, which resulted in a written reprimand.  On February 11, 2004, a conference was held on Mr. Riley's failure to remove snow at Champion Middle School, at which Mr. Riley was found guilty of nonfeasance/malfeasance and given a one day suspension.  On March 2, 2004, Mr. Riley filed a grievance regarding his one day suspension.  Mr. Riley failed to appear at the March 11, 2004 meeting regarding his grievance.

Since my tenure as Custodial Supervisor, Mr. Riley's file shows that on March 29, 2004, Mr. Riley was transferred to Barrett Middle School.  In August 2004, Mr. Riley was asked to inventory broken and missing tiles, but no inventory was completed.  On September 10, 2004, a conference was held related to the August 27, 2004 incident between Mr. Riley and a co-worker who were yelling at each other at Barrett Middle School.   Mr. Riley was found guilty of malfeasance for unprofessional conduct for use of inappropriate language and making a direct threat to a co-worker. From November 2-4, 2004, Mr. Riley was off work on suspension.  On November 8, 2004, a conference was held for nonfeasance related to Mr. Riley's poor work performance.  The complaints and issue[s] addressed at this hearing included Mr. Riley's absences; leaving school premises on extended trips without notifying administration of his departure; floors were not being cleaned; classrooms were not being cleaned; first floor offices were not vacuumed regularly; has students help him complete his work; extra help had to be called to ready the school for school year; regularly late for work so a co-worker has to open the school building; used profanity and argues with co-worker; used the internet during work hours; sub-par work performance; lack of leadership; not a team player; and talks negatively to staff about the principal.  Mr. Riley was found to [be] guilty of nonfeasance at said hearing.  On November 9, 2004, Mr. Riley [was] injured when a table fell on him while he was storing it.  On January 4, 2005, Mr. Riley returned to work.  From January 6, 2005 to February 10, 2005, Mr. Riley was off from work on various dates and various reasons, which included personal illness, father's illness, suspension

from work.  On April 5, 2005, Mr. Riley hit his shin while at work at Barrett Middle School.  On April 22, 2005, a conference was held about the March 9, 2005 incident between Mr. Riley and Ms. Edwards, and Mr. Riley was found to be guilty of malfeasance.  Mr. Riley was off from work on suspension May 2-13, 2005.  On May 10, 2005, Mr. Riley issued an email to C. Spence related to alleged retaliation.  On May 17, 2005, a hearing was held on Mr. Riley's insubordination at the April 22, 2005 hearing, and Mr. Riley was found guilty and discharged.  In late May 2005, Mr. Riley wrote about retaliation against him.  Mr. Riley appealed his discharge, five day suspension and ten day suspension to the Municipal Civil Service Commission.  A hearing was held before the Municipal Civil Service Commission on February 13, 2006.  On March 27, 2006, the Municipal Civil Service Commission issued its decision, uph[o]lding the five and ten day suspensions and recommending that Mr. Riley be demoted instead of discharged.

(Aff. of Maurice Oldham (doc. #18), ex. 1 ¶¶ 8-9).[3]  In Mr. Riley's deposition, he does not appear to contradict any material assertions.

Thus, in this case, Mr. Riley was disciplined for various reasons throughout his employment with CPS.  It was not until May 2005, seven months <u>prior</u> to Mr. Riley filing an EEOC charge, that he was finally terminated.  The Court cannot conclude that there was any causal connection between protected conduct and adverse employment action where, as here, all adverse employment action occurred <u>prior</u> to the protected conduct.  <u>See</u>, <u>e.g.</u>, <u>Gentry v. Summit Behavioral Healthcare</u>, 197 Fed.Appx. 434, 441 (6th Cir.2006)(unpublished)("We agree with the district court's finding that several of the adverse acts occurred prior to the protected activity").

## IV.

Based on the foregoing, the defendants' motion for summary judgment (doc. #18) is GRANTED.  The case is dismissed with prejudice.

---

[3] Although there apparently was some correspondence by Mr. Riley regarding alleged "retaliation," it has not been made a part of the record, and, in any event, it occurred prior to the filing of the EEOC complaint.

**IT IS SO ORDERED.**

Date: March 13, 2008                                  /s/ John D. Holschuh
                                                      John D. Holschuh, Judge
                                                      United States District Court